UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| J.G. and R.R, personally and in their capacity as parents and next friends of J.R., a minor | : : : : |
| **Plaintiff** | : C.A. No. : : |
| v. | : JURY TRIAL CLAIMED : |
| TOWN OF WESTERLY by and through its Treasurer, DYANN BAKER, and ALEXIS SCHONROG, individually and in her capacity as social worker, Westerly School Department | : : : : : : : |

## COMPLAINT

### JURISDICTION

1. This is a Complaint seeking vindication of minor child J.R.'s right to a school environment free of harassment and discrimination based upon disability pursuant to Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act.  This is also a Complaint seeking to vindicate Plaintiff J.G. and R.R.'s rights to advocate for their son's rights pursuant to the First Amendment of the United States Constitution, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act.  This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. § § 1331 and 1367.

2. Plaintiffs have duly served the Town Council of the Town of Westerly with notice of their claim as mandated by R.I. General Laws. § 45-15-5, but have received no satisfaction.

### PARTIES

3. Plaintiffs J.G. and R.R. are the parents and next friends of J.R., now six years old.

1

4. J.R. suffers from, among other things, a seizure disorder, and at all times relevant to this complaint has been deemed a child with a disability, eligible for special education services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. He is also entitled to reasonable accommodations for his disability pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 as well as the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*.

5. Plaintiffs have resided in the Town of Westerly throughout J.R.'s public school career.

6. The Defendant Town of Westerly is a municipal corporation duly organized under the laws of the State of Rhode Island, and is sued by and through Dyann Baker, its Treasurer.

7. At all times relevant hereto, Defendant Schonrog was employed as J.R.'s social worker in the Westerly School Department.

**FACTS**

8. Among other things, J.R.'s disability substantially impairs his ability to regulate his emotions and behavior, including aggression.

9. J.R. received special education services under an Individualized Education Plan (IEP) for the period of February 1, 2019 to January 31, 2020 ("2019-2020 IEP").

10. Pursuant to the February 1, 2019 to January 31, 2020 IEP, J.R. had been placed in an ". . . integrated preschool class designed primarily for students with disabilities and including children without disabilities that is located in a public school building. Class size maximum of 15 children with less than 50% being children with disabilities."

11. J.R.'s IEP also listed "adult support" as one of the "supplementary aids and services/program modifications/supports for school personnel" which he was to receive to

"assure safety, maintain attention to task, sensory modifications and maintain appropriate body in space."

12. J.R.'s IEP also listed "adult support" as one of the "supplementary aids and services/program modifications/supports for school personnel" which he was to receive for "implementation of sensory diet to improve sensory motor strategies and activities for improved self-regulation."

13. In this placement, and with these supports, J.R. was able to regulate his behavior, successful access his education, and enjoy school.

14. J.R. began kindergarten at Dunn's Corners Elementary School for the 2019-2020 school year on or about September 5, 2019.

15. In the months leading up to the 2019-2020 school year, J.R.'s family also alerted Westerly officials that J.R. was suffering recurrence of his seizures, and had needed to have his medications changed.

16. J.R.'s teacher had in fact noted that J.R.'s behavior was odd and "spacy," another signal that his seizure disorder was recurring.

17. Defendant Alexis Schonrog was a social worker serving on J.R.'s IEP Team.

18. Kindergarten represented a more challenging setting for J.R., in that it contained more children, but less structure.

19. The IEP Team determined that J.R. would be placed in a full-day "inclusion" kindergarten, but did not update his supports and services.

20. As J.R. was about to begin kindergarten, J.R.'s family had met with Dunn's Corners staff to discuss their concerns about J.R.'s ability to manage his behavior, but had been assured that J.R. would receive 1:1 support at all times.

21. Westerly failed to provide appropriate accommodations to J.R. in this new kindergarten setting.

22. As a result of this failure to provide appropriate accommodations, J.R.'s behavior deteriorated.

23. Over the fall of 2019, J.R.'s parents were repeatedly summoned to the school to pick up J.R. from school early due to his becoming dysregulated, thus depriving him of access to education.

24. On numerous occasions when J.R. became dysregulated, he was confined to what J.R. referred to as the "nothing room."

25. The "nothing room" contained nothing but cinderblock walls, with some gym mats.

26. During this time in the "nothing room," J.R. would not have access to his education, but would often roll himself up in one of the gym mats, afraid to come out.

27. J.R.'s confinements to the "nothing room" could last as much as several hours.

28. Over the fall of 2019, and into the winter, J.G. and R.R. repeatedly attended IEP meetings and other meetings with school officials, expressing their concerns about the amount of time that J.R. was spending confined to the "nothing room," and advocating for more supports for J.R.

29. J.G. and R.R. would also relay reports from J.R.'s physician, indicating that J.R.'s aggression may be caused by his new medication regime.

30. J.R.'s aunt is a registered nurse and is the Head Nurse at an educational program for disabled children in Massachusetts.

31. As a result of this work experience, J.R.'s aunt is familiar with how to deal with children with behavioral issues.

32. J.R.'s aunt came to at least one meeting with school officials, and contributed a number of suggestions as to how to help J.R. regulate his behavior in spite of his disability.

33. Based on J.R.'s past history, Westerly was aware that if given proper support, J.R. could and had been able to regulate his behavior and access his education.

34. Despite the efforts and inputs of J.R.'s family, Westerly failed to provide or implement accommodations that would allow J.R. to maintain his behavior in the kindergarten environment.

35. J.R.'s family made a number of suggestions as to how to better manage J.R.'s behavior and keep him in the classroom, but these were not implemented.

36. Instead, Westerly officials would insinuate to J.G. and R.R. that J.R.'s behavior was the result of family dysfunction rather than a need for additional accommodation and support for his disability.

37. Defendant Alexis Schonrog in particular promoted the idea that J.R.'s behavior was the result of family dysfunction rather than a need for additional accommodation and support for his disability.

38. As time went on, Westerly would target J.R. by repeatedly confining J.R. to the "nothing room" for normal child-like misbehavior.

39. By January, 2020, J.R. had changed from a child who was happy to go to school, to one who was anxious, resistant, and tearful about going to school.

40. On or about January 9, 2020, J.R. once again became dysregulated at school.

41. Westerly officials called J.R.'s parents, stating that J.R. was once again dysregulated and needed to be brought to Westerly Hospital's Emergency Room for an evaluation.

42. R.R. went to the school to retrieve J.R.

43. Westerly officials falsely suggested to R.R. that he did not have the right to pick up and transport J.R. himself, and that they had the right to have J.R. sent to the hospital by ambulance if they chose.

44. R.R. was ultimately permitted to bring J.R. to Westerly Hospital himself.

45. While J.R. was being transported to Westerly Hospital, Schonrog contacted Tim Wade, a Gateway Health clinician working at Westerly Hospital, and made false allegations that J.R. was being sexually abused.

46. Schonrog had a previous relationship with Wade.

47. Schonrog based her allegations of sexual abuse on J.R.'s referring to urine, feces, and genitalia, and use of scatological terms.

48. Schonrog knew that such behaviors are normal for kindergarteners, and do not indicate child abuse.

49. Schonrog's reports were not made out of a good-faith, reasonable belief that J.R. was being sexually abused, but in order to retaliate against J.R.'s parents for advocating for their son.

50. Schonrog had previously responded in a hostile manner when J.R.'s parents had advocated for additional accommodation and support for his disability.

51. Wade investigated the possibility of an emergency involuntary certification for J.R., but was told by physicians that it was not warranted.

52. Gateway Health also contacted the Aubin Center, a program for sexually abused children operated by the Lifespan Corporation.

53. Aubin Center took the position at that time that there were no grounds to hold J.R.

54. J.R. was released to his parents on January 9, 2020, with instructions to follow up with the Aubin Center.

6

55. J.R.'s parents contacted the Aubin Center as instructed.

56. J.R. was found not to be a candidate for Aubin Center's programs as there was no evidence of sexual abuse.

57. Over the period of January 13, 2020 and January 25, 2020, Alexis Schonrog made a number of contacts to the child abuse hotline maintained by the State of Rhode Island Department of Children, Youth and Families.

58. Schonrog repeatedly maintained that J.R. was being sexually abused, again basing her accusations on what she knew to be normal kindergartener behavior.

59. J.R.'s parents attended another meeting with the school on January 17, 2020.

60. During that meeting, Schonrog continued to suggest that J.R. was being sexually abused.

61. During that meeting, J.R.'s parents relayed that Aubin Center had stated that J.R. was not a candidate for its program because there was no evidence that J.R. was being or had been sexually abused.

62. During that meeting, Schonrog accused J.R.'s parents of lying about having consulted with the Aubin Center.

63. During that meeting, another call was made to the Aubin Center at Schonrog's insistence.

64. Aubin Center reiterated that J.R. was not a candidate for Aubin Center's programs because there was no evidence that he was being or had been sexually abused.

65. Schonrog was visibly displeased with the Aubin Center's response, and made further calls to DCYF.

66. Over the week of January 21, 2020, J.R.'s parents were being called to pick up J.R. due to dysregulation on a daily basis.

67. On January 23, 2020, Westerly personnel summoned an ambulance, and J.R. was transported to the Westerly Hospital Emergency Room.

68. Schonrog had persisted in contacting DCYF alleging that J.R. had been or was being sexually abused.

69. On or about January 24, 2020, a DCYF staff worker visited the home.

70. Said staff worker referred to the number of calls from Schonrog as "unbelievable," and not related to any legitimate concern about J.R.'s welfare.

71. Said staff worker relayed that he had gone to his supervisor, who had stated that Schonrog ". . . must have something against this child's mother."

72. Said staff worker concluded that there was no need for DCYF involvement.

73. J.R. spent the end of January, 2020 to the beginning of March, 2020 in a partial hospitalization program due to his seriously dysregulated behavior.

74. On Friday, February 12, 2020, J.R.'s parents attended a meeting with Westerly officials to discuss J.R.'s behaviors.

75. When J.R.'s parents attempted to discuss appropriate accommodations for J.R.'s disability, Westerly officials immediately began repeating their allegations that J.R. was being mistreated at home.

76. On March 4, 2020, J.R.'s parents attended another meeting at the partial hospitalization program with Westerly officials.

77. During that meeting, Schonrog defended her having repeatedly contacting DCYF, asserting that J.R.'s use of the term "poop cookies" warranted a report of child abuse.

78. In March, 2020, Westerly placed J.R. in a therapeutic school setting, where he remains.

**COUNT I**
**SECTION 504 OF THE REHABILITATION ACT and**
**AMERICANS WITH DISABILITIES ACT**
**(Hostile Environment/Failure to Provide Accommodations)**

79. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

80. The Americans with Disabilities Act prohibits discrimination on the basis of disability and further prohibits retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

81. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability and further prohibits retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

82. The Defendant, Town of Westerly receives federal financial assistance, as defined by 29 U.S.C. § 794, and, as such, may not discriminate against a person because of disability, nor may it retaliate against individuals who advocate for the rights of individuals with disabilities.

83. The Defendant, Town of Westerly, is a "public entity" as defined in 42 U.S.C. § 12131(1), and receives federal financial assistance so as to be covered by the mandates of the ADA.

84. J.R. was a qualified individual with a disability pursuant to both Section 504 and the ADA.

85. Pursuant to Section 504 and the ADA, J.R. had a right to be free of discrimination and harassment based upon his disability, and also had the right to accommodations based upon his disability.

86. The Town of Westerly failed to provide accommodations for J.R.'s disability.

87. Due to the inaction of the Town of Westerly, and the actions and inactions of Defendant Schonrog, J.R. was subjected to harassment and discrimination based upon his disability by staff member.

88. Said harassment and discriminatory treatment was so severe and pervasive, and objectively offensive that it denied J.R. equal access to his education.

89. Defendants Schonrog and the Town of Westerly had actual knowledge of said harassment, but were deliberately indifferent to the same in that they failed to take effective action to stop the harassment and discrimination.

90. As a direct and proximate result of the wrongful actions of Defendants Town of Westerly and Schonrog, Plaintiffs have suffered financial harm, as well as emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

91. Said actions of Defendants were done with conscious disregard to Plaintiffs' legal rights.

92. Said actions of Defendants were wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants Town of Westerly and Schonrog, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

### COUNT II
### SECTION 504 OF THE REHABILITATION ACT and
### AMERICANS WITH DISABILITIES ACT
### (Retaliation)

93. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

94. Section 504 of the Rehabilitation Act and the Americans with Disabilities Act prohibit retaliation for the exercise of protected conduct, including advocacy for the rights of individuals with disabilities.

95. Plaintiff J.G. and R.R. engaged in protected activity by advocating for the rights of their son, a student with a disability within the meaning of both Section 504 and the ADA, by advocating for appropriate educational services and for cessation of disability-based harassment.

96. Plaintiff J.G. and R.R.'s protected activity was a substantial or motivating cause of retaliatory action against them and J.R. by the Defendants Town of Westerly and Defendant Schonrog.

97. This retaliation took the form of tolerating a hostile educational environment for J.R., as well as falsely reporting that J.R. was being sexually abused.

98. As a direct and proximate result of the wrongful actions of Defendants Town of Westerly and Schonrog, Plaintiffs have suffered financial harm, as well as emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

99. Said actions of Defendants were done with conscious disregard to Plaintiffs' legal rights.

100. Said actions of Defendants were wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants Town of Westerly and Schonrog, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

## **COUNT III – 42 U.S.C. § 1983 (Fourteenth Amendment)**

101. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

102. The Fourteenth Amendment of the United States Constitution guarantees the right to equal protection under the law.

103. Defendant Town of Westerly and Defendant Schonrog, acting under the color of state law, unlawfully deprived J.R. of his right to equal protection under the law.

104. Defendant Schonrog deprived J.R. of his right to equal protection under the law by failing to take action to remediate a hostile educational environment for J.R., as well as falsely reporting that he was being sexually abused.

105. The Defendant Town of Westerly failed to train, supervise, and discipline Defendant Schonrog for her actions against J.R. and his family, and thus permitted Defendant Schonrog to be in a position to violate J.R.'s right to equal protection.

106. The Defendant Town of Westerly, being aware that Defendant Schonrog was engaged in a course of discriminatory conduct against Plaintiffs and failing to train, supervise, and discipline Defendant Schonrog in response, acted with deliberate indifference towards the Plaintiffs' constitutional rights.

107. As a result of a conscious policy, practice, custom or usage, the Defendant Town of Westerly has permitted and allowed for harassment based upon disability.

108. As a direct result of the actions of Defendants Town of Westerly and Schonrog, Plaintiffs have suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

109. Said actions of Defendants were done with conscious regard for the legal rights of Plaintiffs.

110. Said actions of Defendants were wicked, wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

### COUNT IV – 42 U.S.C. § 1983 (First Amendment Retaliation)

111. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

112. The First Amendment of the United States Constitution guarantees the right to petition for redress of grievances.

113. Plaintiffs J.G. and R.R. attempted to exercise their right to petition for redress of their grievances and advocate for their son regarding appropriate educational services and protection from disability-based harassment.

114. Defendant Town of Westerly and Defendant Schonrog, acting under the color of state law, unlawfully retaliated against Plaintiff J.G. and R.R. for having exercised their right to petition for redress of grievances.

115. Defendant Schonrog's retaliation took the form of failing to take action to remediate a hostile educational environment for J.R., as well as falsely reporting that J.R. was being sexually abused.

116. The Defendant Town of Westerly failed to train, supervise, and discipline Defendant Schonrog for her actions against J.R. and his family, and thus permitted Defendant Schonrog to be in a position to violate the Plaintiff's constitutional rights.

117. The Defendant Town of Westerly, being aware that Defendant Schonrog was engaged in a course of retaliatory conduct against Plaintiff and failing to train, supervise, and discipline Defendant Schonrog in response, acted with deliberate indifference towards the Plaintiff's constitutional rights.

118. As a result of a conscious policy, practice, custom or usage, the Defendant Town of Westerly has permitted and allowed for harassment based upon exercise of First Amendment rights.

119. As a direct result of the actions of Defendants Town of Westerly and Schonrog, Plaintiff has suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

120. Said actions of Defendants were done with conscious regard for the legal rights of Plaintiff.

121. Said actions of Defendants were wicked, wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

## COUNT V
### Negligence

122. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

123. Defendant Schonrog had a special relationship to J.R. as school social worker, and therefore, had a duty to use reasonable care in the supervision, custody, care and/or education of J.R. under state and federal law.

124. Defendant Town of Westerly had a duty to exercise reasonable care in the supervision, custody, care, and education of J.R.

125. Defendants breached that duty by failing to take reasonable actions to prevent J.R. from suffering discrimination and harassment based upon his disability, and by otherwise targeting him in order to retaliate against his parents for advocating on his behalf.

126. Defendant Town of Westerly breached that duty when it failed to train, supervise, or discipline Defendant Schonrog, its staff, and other students and otherwise prevent them from subjecting J.R. to discrimination, harassment, and retaliation.

127. As a direct result of the actions of Defendants Town of Westerly and Schonrog, Plaintiffs have suffered and will continue to suffer financial harm, emotional distress, personal inconvenience, worry, loss of enjoyment of life, and other non-pecuniary losses.

128. Said actions of Defendants were done with conscious regard for the legal rights of Plaintiffs.

129. Said actions of Defendants were wicked, wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an

amount sufficient to confer jurisdiction upon this Court.

## COUNT VI
### (Rhode Island Civil Rights Act)

130. Plaintiffs re-allege those averments contained in the Paragraphs above as if fully re-stated herein.

131. Rhode Island Gen. Laws § 42-112-1 *et seq.* provides, in pertinent part:

(a) All persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have, except as is otherwise provided or permitted by law, the same rights to make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and are subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

132. J.R. is a disabled person and has a disability covered by R.I.G.L. § 42-112-1 *et seq*.

133. Defendants, by their individual and concerted acts and omissions, including, but not limited to, those described herein, discriminated against J.R.. based upon his disability by subjecting him to a hostile educational environment, failing to provide appropriate accommodations, retaliating against Plaintiffs, and falsely reporting that J.R. was being sexually abused.

134. Defendants' actions were outrageous, wicked and wanton, and for the good of society must be punished.

WHEREFORE, Plaintiffs demand judgment against Defendants, including but not limited to injunctive relief, compensatory and punitive damages, attorneys' fees and costs in an amount sufficient to confer jurisdiction upon this Court.

Plaintiffs,
By their attorney,

/s/ Vicki J. Bejma
Vicki J. Bejma #6498
Robinson & Clapham
123 Dyer Street, Suite 135
Providence, RI  02903
(401) 331-6565
(fax) 331-7888
vbejma@smrobinsonlaw.com

17